ELIZABETH L. EVANS, APPELLEE, v. ERNEST L. C. GILMORE, APPELLANT.

FILED DECEMBER 19, 1916.   No. 19133.

Landlord and Tenant: LEASE: CONSTRUCTION.   Controversy over a lease and contract covering real estate.   The substance of the contracts is set out in the opinion.   *Held,* the record is free from error, and the judgment is sustained by the evidence.

APPEAL from the district court for Douglas county: WILLIS G. SEARS, JUDGE.   *Affirmed.*

*Frank L. McCoy* and *Weaver & Giller,* for appellant.

*Berge & McCarty, contra.*

HAMER, J.

This case comes here on appeal from the district court for Douglas county, Nebraska. The plaintiff and appellee, Elizabeth L. Evans, brought the action against the defendant and appellant, Ernest L. C. Gilmore. The plaintiff seeks an accounting for the rents and profits of a 240-acre farm, which the defendant has been occupying for a period of more than five years. In her petition the plaintiff also asks for the cancelation of a certain written instrument. The defendant placed the instrument of record. The plaintiff alleges that it is void. She alleges that she was the owner of the 240-acre farm, except 40 acres in which she had an undivided half interest, and that she afterwards purchased the other

half interest in said 40 acres. She leased the whole 240 acres to the defendant for five years, commencing March 1, 1910. The defendant was to deliver her one-third of all the crops he raised. The lease provided that the tenant should harvest the crops, put the rent share in the granary, and haul and deliver the same to market as the plaintiff wished it to be done.

It is alleged by plaintiff that the defendant violated this lease; that he would not put the plaintiff's share of the grain in the granary by itself; that the plaintiff could never obtain any settlement with the defendant of the crops grown; that the defendant would sell the grain or feed it to the stock, and, except about 1,000 bushels of corn, he never accounted to the plaintiff, and did not pay her any rent, except a very small portion thereof. He appears to have kept several horses and some cattle and a number of hogs, and he fed them out of the crops without taking any rent share from the same. Much of the time the defendant appears to have been busy with a ditching and grading machine working for the neighbors. He apparently had plans for the future improvement of the farm which he never put into effect. He also claims that he made an arrangement by which he was to improve the condition of the farm and have a certain share in the profits in case he should sell the property for a sum above $16,000. The defendant claims that he took possession under his lease, the lease being for five years, and there was also a contract which, omitting place of execution, date, and signatures, reads:

"It is hereby agreed between the parties, E. L. Evans and E. D. Evans, parties of the first part, and Ernest L. C. Gilmore, party of the second part, to wit: That party of the second part shall have one-half of the sum above sixteen thousand (16,000) dollars for which the land, 220 acres, lying in sections 16 and 21, township 16, range 10, Douglas county, Nebraska, which now is the property of the parties of the first part, may sell. To this estimated value, $16,000, is to be added whatever

sum the Elkhorn Valley Drainage District may levy upon said land by way of cost for drainage in straightening Elkhorn river and making lateral ditches. And it is hereby further agreed that such party of the second part is authorized and given full authority to deal with said land in regard to the drainage and before the drainage board as if it were his own."

At the same time that it is claimed the foregoing contract was made, February 28, 1910, the lease was made. The lease stipulates that the party of the first part, E. L. Evans and E. D. Evans, wife and husband, leased to Ernest L. C. Gilmore the land described for the term of five years after the first day of March, 1910. The party of the second part, Ernest L. C. Gilmore, covenants that he will do the work in a good and workman-like manner and in good season, that he will plant a certain number of acres in corn, a certain number of acres in wheat, and a certain number of acres in barley, and that he will put 65 acres in grass. There are also in the lease the usual covenants with respect to keeping the crops free from weeds. There is also the agreement to haul the plaintiff's share of the grain to the nearest market at such time as the party of the first part may request.

The defendant claimed that on or about August 8, 1914, he made an oral bargain to purchase the farm, and that under this bargain he made certain substantial and valuable improvements, and he claims a right to the premises by virtue of this oral agreement, as also under the contract in writing. He claimed that this agreement to purchase the farm was oral, but that the plaintiff promised to reduce it to writing. He further claimed that, because of this new contract to purchase the farm, he built a new hog house, and hauled some dirt, and built some fences, and also sowed some wheat and grass, and that he was ready to perform the contract of purchase.

The defendant's possession was acquired under and by virtue of his lease, and his right of possession was never changed under or by reason of his other negotiations with the plaintiff. *Bigler v. Baker*, 40 Neb. 325; *Lewis v. North*, 62 Neb. 552. To take an oral sale out of the statute of frauds, there must be both possession and valuable improvements, and both must be under the contract of purchase, or else there must be a full and complete performance by the vendee. *Teske v. Dittberner*, 70 Neb. 544; *Moline v. Carlson*, 92 Neb. 419; *Damkroeger v. James*, 95 Neb. 784; *Cobb v. Macfarland*, 87 Neb. 408.

In *Teske v. Dittberner, supra*, it is said in the fifth paragraph of the syllabus: "Performance of services of such a character that their value cannot be estimated by a pecuniary standard, so that the court cannot restore the promisee to the situation in which he was when the contract was made, or compensate him in damages, is sufficient to take such an agreement out of the statute of frauds." In the same case it is said in the sixth paragraph: "While, in general, a contract for personal service, where full performance rests upon the will of the contracting party, is not specifically enforceable at suit of either party, when such services have been rendered or there has been a substantial performance of his contract on the part of the person agreeing to render them, the reason of the rule ceases, and the contract may be enforced."

In *Moline v. Carlson, supra*, it is said: "The rule is now well settled in this court that a parol contract will be enforced by a court of equity, where one party has wholly and the other partly performed it, and its nonfulfilment on the one hand would amount to a fraud upon the party who has fully performed it."

In *Damkroeger v. James, supra*, it is said in the syllabus: "Specific performance of a parol contract will be enforced by a court of equity, where one party has wholly and the other partly performed it, and its non-

fulfilment on the one hand would amount to a fraud on the party who has fully performed it."

The foregoing language seems to have been first used in *Kofka v. Rosicky*, 41 Neb. 328. Since then similar language has been used in *Hespin v. Wendeln*, 85 Neb. 172; *O'Connor v. Waters*, 88 Neb. 224; *Peterson v. Bauer*, 83 Neb. 405. An examination of the evidence in the instant case shows that the facts required by the authorities cited do not exist.

The defendant is shown by the evidence to have been an undesirable tenant. He was not a very good farmer, and he kept nearly all that he raised. He also let the farm run down. The improvements that he claimed to have made were of no substantial value. He had no opportunity apparently to fail without improving it.

The defendant in this case married the plaintiff's granddaughter. In looking over the evidence it is suggested to the mind of the writer that the plaintiff was very patient with him. How far the defendant has been influenced in his conduct towards the plaintiff by the fact that he is married to the plaintiff's granddaughter can only be surmised. His testimony concerning the number of acres that he put in corn and the number that he put in wheat is most unsatisfactory, as also the number of acres in rye. He testified that he did not feed any corn in 1913 to his own stock. It is in testimony that he fed out of this corn crop by the wagon-load. He made no division; he kept feeding out of the crop. He did not have any idea of how much timothy hay he used in 1914, but he used all of it, whatever it was. He did not deny what he had done, at least he did not always deny it, but he invariably took the crop. He also was very uncertain concerning the improvements that he had made. He sold the wheat crop of 1914 for $1.04 a bushel. He was unable to testify to the fact, but he kept the money.

Perhaps the only matter in controversy is the contract that was made at the time the lease was executed, and

the subsequent oral contract. Remember that the defendant's wife is the mother of the plaintiff's great grandchildren. There are some possible matters of embarrassment about this case. There is no controversy about the contract made at the time the lease was executed, except as to the effect of it. The defendant testified that he told the plaintiff that he would take the place and try to make it salable, and that he would build it up, and that he would take it at a valuation of $16,000, and that the plaintiff should furnish the material, and he would build the place up for sale and receive one-half of the profits above the $16,000, with the expense of drainage added thereto. The plaintiff understood the defendant wanted the land for five years, and wanted it so that he would not have to move off during that time, and if he did have to move off that he would then be paid for his improvements; that if he built the place up and improved it, and it was sold during the term of his lease, he did not want to lose the value of his improvements. It was thought that some ditching should be done and the buildings painted, and that the crops should be rotated, and the place generally should be improved. If sold, the defendant would have as pay for his improvements half of the excess above the $16,000, with the expense of drainage added thereto; if the place was not sold, then the defendants would not be damaged; if the place was sold, then he was to receive the sum above mentioned. The defendant did substantially nothing. He cut some brush which was to be used in making an automobile road. He did a little ditching, but he farmed right over the ditch and sowed oats in the bottom of it. The plaintiff paid for all the paint on the house and barn; she also paid for the new pump and the grass seed and materials used in repairs. The agreement made at the time of the lease would seem to have no application to the controversy between the parties, for the reason that it contemplated that a sale might be made. The five years expired. No sale was made. No sale is con-

templated, and the defendant has done nothing to justify any prospect of a sale. He has nothing in the premises to lose. The defendant has no rights under the contract in writing. When interrogated: "Then you are still claiming under exhibit B, are you? still claiming rights under exhibit B? A. No, sir." Notwithstanding what he said, his main •contention is the validity of the contract. In *Manning v. Ayers*, 77 Fed. 690, under a similar contract, the court held that it conveyed no interest whatever in the land. There the defendant wanted the land sold so that he might receive half the price of the same above the agreed value at the time the contract was entered into. The court held he was not entitled to such relief.

In *Campbell v. American Handle Co.*, 94 S. W. 815 (117 Mo. App. 19), the plaintiff and defendant entered into a contract for the cutting and delivery to the factory of certain timber. In that case the court said that the plaintiff was only entitled to pay for the timber which he actually cut and delivered; that the contract lacked mutuality, in that it did not bind him to do anything. The court said in the syllabus: "In a contract under which plaintiff was to cut and deliver at defendant's factory timber of certain dimensions, at a certain price, but which did not bind plaintiff to furnish any specified quantity thereof, but left him at liberty to cease cutting and delivering at any time, there was no mutuality of contract." In the body of the opinion it was said: "We think the contract is void for want of mutuality. Plaintiff was not bound to cut and deliver any specific number of cords of bolts or any specific number of feet of saw stocks, nor was he bound to cut all the ash timber on any particular tract of land, or any tract of land."

In *Steinwender-Stoffregen Coffee Co. v. Guenther Grocery Co.*, 80 S. W. (Ky.) 1170, it was said: "As we have said, it is a fundamental principle of law that there must be mutuality in every contract. If one of the parties is not bound, then the other is not.   *   *   *   'There are

many cases in which the offer is definite enough, yet the acceptor, by merely accepting, has really himself promised nothing in return—has not made himself liable for anything—so that, although one is bound, the other is not, and the engagement lacks what is called "mutuality." In such a case there is not an enforceable agreement. The most frequent example of this principle is when one offers to supply another with such goods of a certain kind as he may choose to order or may wish during a certain time and the other accepts the offer. Here there is no consideration for the promise or offer, for the promisee has not bound himself to anything, and has incurred no legal liability at all.' "

In the contract referred to the defendant did not bind himself to do anything. Even if the contract should be considered as part of the lease because executed at the same time, still the defendant is not bound to do anything in that part of the contract which he signed. As the defendant did nothing which could give him any property in the land, he is not entitled to anything.

In the contract of August 8, 1914, which was oral and was not signed, there was no legal obligation unless defendant did something by reason of the said oral contract which substantially increased the value of the land and which was done because of the contract. The defendant had a lot of hands. They were at work for him in his ditching and grading enterprises. Any increase in the improvements which he made appears to have been made for the purpose of enabling him to take care of these men who were engaged by him to assist him in his ditching and grading work. An examination of appellant's brief and the decisions which he cites shows that the latter are not in point. We refer to the following, and give a statement concerning the cases as we understand them. In *Smith v. Gibson*, 25 Neb. 511, there was a lease for a specific time with rent payable monthly. It contained a proviso that the tenant might purchase the premises for a stipulated price. When notified by the tenant that

he accepted the terms of the purchase, the defendant acquiesced and said that he accepted the offer, but subsequently he refused to convey because, as he alleged, he did not like the man from whom plaintiff was about to obtain the money to complete the purchase. In *Donahue v. Potter & George Co.*, 63 Neb. 128, the contract was not revocable because the parties had gone so far that $3,000 had been paid and the deeds placed in escrow until the proper payments could be computed and made. In *Dickson v. Stewart*, 71 Neb. 424, it was held, in substance, following *Bigler v. Baker*, 40 Neb. 325: "Want of mutuality is no defense, even in an action for specific performance, where the party not bound thereby has performed all of the conditions of the contract and brought himself clearly within its terms."

In *Bigler v. Baker, supra,* if there had been a want of mutuality, it would not be a valid objection to plaintiff's right to recover, because everything was done that it was contemplated might be done. In the instant case nothing was done.

The following statement is, in substance, taken from the appellant's brief: The 240 acres of land in controversy in this case is situated on the Elkhorn river a short distance northeast of Valley. Mr. and Mrs. Evans lived on this land from 1871 to 1891, and were among the prominent farmers in that part of the county. The family consisted of Mr. and Mrs. Evans and six children, among whom were William Evans, the father of the defendant's wife, so that the defendant's wife is the grandchild of the plaintiff. The defendant's father, Captain Gilmore, was also a prominent citizen of Douglas county, and owned one of the best farms between the Evans farm and Valley. His family consisted of several children, among them this defendant, who has been quite active in the affairs of the county, and is at the present time chairman of the drainage board of the Elkhorn Drainage District. A brother, John Gilmore, is president of the Farmers Club at Valley, and another brother is instructor

in the University of Nebraska. So it will be observed at the outset that the families interested in this lawsuit are prominent. Mr. and Mrs. Evans' children, as the court will need to know, are William, Mary (Mrs. T. J.) Oliver, Annie Portlock, Martha Evans, Alvin and Frank. William and Mary were married before the family left the farm, and the others went with their parents to Bethany. William has lived in Nebraska part of the time. The Olivers were for many years at Falls City. The Portlocks were at Havelock or Bethany. Alvin has been for several years at Pullman, Washington, and Frank and Martha have been in Idaho. Alvin has all along been his mother's adviser. This suit was brought by the plaintiff primarily to cancel the contract of February 28, 1910, which gave defendant certain special rights. However, the record in the case is largely made up of testimony with reference to an accounting between plaintiff and defendant for the rents and profits of this farm during the time the defendant occupied it under the aforesaid contract. There are two contracts which form the real basis of this controversy. One is the contract of February 28, 1910, above referred to, providing for the sale of the land and division of the proceeds between plaintiff and defendant; and the other is the contract of August 8, 1914, wherein plaintiff, as alleged, agreed with defendant to sell the farm to him on certain terms and conditions. Both contracts were made at the solicitation of the plaintiff. The former was put into writing and signed. The terms of the latter were agreed upon and set down in a memorandum, but not signed. "The accounting is merely incidental to the main contention of the plaintiff, and was thrown in" to give jurisdiction.

An examination of the evidence shows a long and unsuccessful struggle on the part of the plaintiff to get rid of the husband of her granddaughter. She is justified in not wanting to retain him as a tenant, or in anyway connected with the farm. One of her sons (Alvin) wrote several letters, which are shown by the record and the

briefs.  He appears to have been friendly to the defend-
ant until he afterwards lost his patience in attempting
to assist the defendant to become reconciled to the idea
that his mother should get rid of him as an unprofitable
tenant and recover possession of the land.  On April 16,
1915, the temporary injunction issued before that time
was made permanent.  It enjoined the defendant "from
asserting, claiming or in any way attempting to enforce
any right, claim or title in or to said real estate by reason
of a certain agreement dated Bethany, Nebraska, 2/28/10,
signed by Elizabeth L. Evans and Ernest L. C. Gilmore,
and filed for record by said defendant in the office of the
register of deeds of said county of Douglas."  The order
was to take effect upon the giving of an undertaking in
the sum of $1,500, with an approved surety.  The bond
was approved.  The judgment canceled and annulled the
instrument referred to, and enjoined the defendant and
prohibited him from ever claiming any right, title, claim
or interest in or to said real estate, or any part thereof,
and that the plaintiff recover of said defendant the pos-
session of all of said real estate and have a writ of resti-
tution therefor, and "that this decree does not abate
any action at law now pending between the parties here-
to for the possession of said real estate by plaintiff, and
that she may pursue her right of possession therefor,
either by writ of restitution herein or by action at law."
Concerning the alleged sale of the place, it is sufficient
to say that there never was any contract in writing, and
that there never were any substantial improvements made
on the place by the defendant under the said oral agree-
ment.  He did certain things with a view to enabling him
to take care of a large number of men in his employ in
the ditching and grading business.  The plaintiff was
averse to selling the land without the consent of her
children.  She was timid about making bargains with
the apparently visionary man who had married her grand-
daughter.

On Friday evening, August 14, the defendant and his wife came to the home of the plaintiff at Bethany. The next day, which was Saturday, they remained there. Certain of the children were present. There were conversations between the plaintiff and the defendant. It was warm weather, and their conversations appear to have been out in the yard. The defendant seems to have wanted to buy the place for $18,500, but he did not have anything to pay down. He only wanted to pay 4 per cent. interest, and then he wanted to make a payment, so he said, of $1,000 a year. The plaintiff and defendant had some conversation. The proposition does not appear to have interested the plaintiff very much, as the terms were not at all satisfactory to her. She said that she would think about it, and the defendant wrote a little paper supposed to contain his offer. The plaintiff appears to have handed this little paper to William, the father of defendant's wife, with a statement that there was Ernest's offer for the land. It is as follows: "Farm Contract of Sale: $18,500, on ten years time, at 4 per cent. interest, payable semi-annually on October 1st and March 1st each year, together with enough of principal to equal $1,000 in all, that part of principal to be paid March 1st each year, with privilege of paying all or any part of principal at any time. Interest to date from March 1st, 1915."

It should be remembered that the trial court had the witnesses before it, and the judge saw them, and had an opportunity to judge of their truthfulness. We are unable to say that the judgment of the district court is wrong, and it is,

AFFIRMED.

LETTON, ROSE and SEDGWICK, JJ., concur in the conclusion.